1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    MIKE JOSEPH CHAVEZ, Jr.,                    No.  2:19-cv-1169 DB P

12                    Petitioner,

13          v.                                    ORDER AND FINDINGS AND
                                                  RECOMMENDATIONS
14    MARION SPEARMAN,

15                    Respondent.

16

17          Petitioner is a state prisoner proceeding pro se and in forma pauperis with a petition for a

18    writ of habeas corpus under 28 U.S.C. § 2254.  Petitioner challenges his conviction imposed by

19    the Sacramento County Superior Court in 2015 on twelve counts of lewd and lascivious conduct

20    with a child under the age of 14 years.  Petitioner claims:  (1) the admission of character evidence

21    violated his due process rights; (2) his counsel was constitutionally ineffective; (3) the prosecutor

22    vouched for witnesses' truthfulness; (4) the prosecutor committed misconduct in argument; (5)

23    the prosecutor presented false evidence; (6) the trial court's denial of a continuance and

24    appointment of an expert violated due process; (7) the prosecutor failed to turn over exculpatory

25    evidence; (8) the admission of prejudicial evidence violated due process; and (9) the cumulative

26    effect of all errors rendered petitioner's trial fundamentally unfair.  For the reasons set forth

27    below, this court will recommend the petition be denied.

28    ////

1

1   **BACKGROUND**

2   **I. Facts Established at Trial**

3         Petitioner was charged with twelve counts of lewd and lascivious conduct with a child

4   under the age of 14 years for molesting his daughter and his stepdaughter in violation of Cal. Pen.

5   Code, § 288(b)(1).  He was sentenced to an aggregate term of 96 years in prison.

6         The California Court of Appeal for the Third Appellate District provided the following

7   summary of the facts presented at trial:

8               Defendant married Marisa M. in 2004. Marisa had a daughter from a
            previous relationship, An. M. Defendant also had a daughter, Al. M.,
9               from a previous relationship.

10              The blended family lived together in several residences before
            settling in a house in Citrus Heights. Marisa's brother, Anthony, also
11              lived with them. At the time, both girls were around the age of eight
            or nine years old.
12

13              Defendant and Marisa had a tumultuous relationship and fought
            often. Both An. M. and Al. M. were scared of defendant. An. M.
14              described defendant as being very abusive towards her mother, both
            emotionally and physically.

15              Al. M. testified that while living at the house in Citrus Heights,
            defendant molested her on numerous occasions. Defendant pulled
16              down her pants and kissed her vagina. He also used his fingers to
            digitally penetrate her vagina, and he rubbed his erect penis against
17              her buttocks. Defendant would often wrap his arms and legs around
            her so she could not move. Defendant also spit in his hand, rubbed it
18              on his penis, and tried to penetrate her vagina and anus.

19              One day, Al. M. walked into the bedroom she shared with An. M.
            and saw An. M. sitting on top of defendant. An. M. silently mouthed
20              to Al. M. to go get her uncle Anthony for help, but Al. M. could not
            find him. The girls did not discuss what had happened.
21

22              According to An. M., defendant began molesting her soon after the
            family moved to the home in Citrus Heights. Like with Al. M.,
23              defendant would rub his erect penis against An. M.'s buttocks. When
            she was home sick from school one day, defendant placed her on top
24              of him, wrapped his legs around her, and began moving her up and
            down. She could feel his erect penis against her vagina. After one
25              incident in which An. M. told defendant to stop rubbing his penis
            against her, defendant told her to hand him his boxer shorts and he
26              masturbated into the shorts in front of her. While An. M. was sitting
            on a couch, defendant groped her breasts underneath her bathing suit.

27              At first, An. M. did not tell anyone what defendant was doing to her
            because he threatened he would kill her mother. Eventually,
28              however, An. M. told her mother in late May 2006 that defendant

2

had tried to have sex with her. Marisa was very upset and called defendant hysterically on the phone to confront him about the accusations. Defendant kept repeating that he did not want to go to jail. After Marisa hung up the phone, Al. M. came into the room and told her that defendant had also been abusing her. Marisa called defendant back and confronted him about Al. M., and defendant did not deny anything; he simply said, "don't call the cops." Defendant arrived home while he and Marisa were still on the phone. According to Marisa, although defendant began denying the conduct, An. M. told him he knew what he had done and that she could take a lie detector test. When she questioned whether he could do the same, defendant hung his head in his hands and did not say anything. An. M., on the other hand, testified that she did not confront defendant when he returned home because Marisa had already sent her upstairs to her bedroom. She said the next day Marisa and defendant picked her and Al. M. up from school and took them to a restaurant where defendant apologized to the girls.

Marisa did not immediately report the accusations to law enforcement because defendant threatened to kill her and the girls and then kill himself. Nearly a week later, Marisa called the police. Later, defendant called Marisa and asked why she had called the police. He apologized and said he was leaving. Defendant ultimately fled to Mexico where he lived under a fake name for the next six years.

An. M. and Al. M. underwent sexual assault examinations nearly two weeks after reporting the abuse. The results of Al. M.'s exam were normal with any injuries having healed between the time of the abuse and the time of the examination. An. M. had normal genital findings as well, but some areas of concern were found around her anus. The medical practitioner who reviewed the exam results explained that the findings could indicate sexual abuse, but were not definitive. She also explained that many children with sexual abuse histories have normal exams.

Both girls also participated in separate taped SAFE interviews with a forensic interview specialist trained in interviewing potential child abuse victims. The recorded interviews were played for the jury.

During her interview, Al. M., who was nine years old at the time, stated that defendant had penetrated her vagina and anus with his fingers, and that he had kissed her private area. She mentioned that defendant had abused her when they lived in an apartment and at the Citrus Heights home, but did not identify any other places where the abuse occurred.

An. M., who was 10 years old, told the interviewer that defendant had molested her several times. While lying behind her, defendant wrapped his legs around her and pushed against her bottom. One time when she was home sick, she was awakened to defendant pulling her pants down and rubbing his penis on her buttocks; he inserted it into her rectum. She said he tried to get to her three times, and "actually got to [her]" four times, meaning penetration.

Defendant was eventually located in Mexico in 2012. He was returned to the United States and charged with multiple counts of lewd and lascivious conduct with a child under the age of 14 years. (Pen. Code, § 288, subd. (b)(1).) Five counts related to An. M. (counts one to five) and seven counts related to Al. M. (counts six to twelve). He pleaded not guilty to all charges.

At trial, An. M., Al. M., and Marisa testified to the above described events. Over defendant's objection, and pursuant to Evidence Code 2 section 1101, subdivision (b), the prosecution also introduced evidence of defendant's consensual sexual practices with Marisa when they were married. Marisa testified that defendant liked her to dress up like a little girl with pigtails in a little skirt, and that he wanted her to call him "daddy." He also liked to engage in anal sex.

The prosecution also presented evidence of uncharged sexual misconduct with Al. M., which she testified started when she first moved in with defendant. At the time, they lived in a room in his grandmother's garage. She estimated that she was about four years old, but she was unsure of her exact age. Almost immediately defendant began touching her in a sexually inappropriate manner. On several occasions, defendant used his fingers to digitally penetrate her vagina, and rubbed his erect penis against her buttocks. He inserted his penis into her vagina and tried, unsuccessfully, to penetrate her anus as well. Al. M. did not tell anyone because she was scared. Defendant did not object to this evidence.

People v. Chavez, No. C082435, 2017 WL 4159617, at *1-2 (Cal. Ct. App. Sept. 20, 2017).

**II.  Procedural Background**

### A.  Judgment and Sentencing

The jury convicted petitioner of all charges.  The court sentenced him to an aggregate term of 96 years in prison, consisting of consecutive terms of eight years each for the twelve counts of lewd and lascivious conduct.

### B.  State Appeal, State Habeas, and Federal Proceedings

Petitioner timely appealed.  On September 20, 2017, the California Court of Appeal, Third Appellate District, affirmed the judgment.  Chavez, 2017 WL 4159617.  Petitioner filed a petition for review with the California Supreme Court.  (Lodged Document ("LD") 7.[1])  On November 29, 2017, the California Supreme Court summarily denied review. (Exhibit to Answer ("Ex.") 2.)

////

---

[1] Respondent filed the state court decisions as exhibits to the Answer (ECF No. 16) and electronically lodged the remaining state court record (ECF No. 17).

On December 27, 2018, petitioner filed a petition for writ of habeas corpus with the California Supreme Court.  (LD 8.)  On May 15, 2019, the California Supreme Court summarily denied the petition.  (Ex. 3.)

Petitioner filed the present federal habeas petition on June 3, 2019.  (ECF No. 1.) Respondent filed an answer (ECF No. 16) and petitioner filed a traverse (ECF No. 20).

**STANDARDS OF REVIEW APPLICABLE TO HABEAS CORPUS CLAIMS**

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Greene v. Fisher, 565 U.S. 34, 37 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).  Circuit court precedent "'may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably.'"  Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not

5

announced." Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 567 U.S. 37 (2012)).  Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct." Id. at 1451.  Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue.  Carey v. Musladin, 549 U.S. 70, 76-77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640 (2003) (quoting Williams, 529 U.S. at 405-06).  "Under the 'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] [Supreme] Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.'"  Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413); Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004).  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Williams, 529 U.S. at 411; see also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Andrade, 538 U.S. at 75 ("It is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous." (Internal citations and quotation marks omitted.)).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

////

1     There are two ways a petitioner may satisfy subsection (d)(2).  Hibbler v. Benedetti, 693

2     F.3d 1140, 1146 (9th Cir. 2012).  He may show the state court's findings of fact "were not

3     supported by substantial evidence in the state court record" or he may "challenge the fact-finding

4     process itself on the ground it was deficient in some material way." Id. (citing Taylor v. Maddox,

5     366 F.3d 992, 999-1001 (9th Cir. 2004)); see also Hurles v. Ryan, 752 F.3d 768, 790-91 (9th Cir.

6     2014) (If a state court makes factual findings without an opportunity for the petitioner to present

7     evidence, the fact-finding process may be deficient and the state court opinion may not be entitled

8     to deference.). Under the "substantial evidence" test, the court asks whether "an appellate panel,

9     applying the normal standards of appellate review," could reasonably conclude that the finding is

10    supported by the record.  Hibbler, 693 F.3d at 1146 (9th Cir. 2012).

11    The second test, whether the state court's fact-finding process is insufficient, requires the

12    federal court to "be satisfied that any appellate court to whom the defect [in the state court's fact-

13    finding process] is pointed out would be unreasonable in holding that the state court's fact-finding

14    process was adequate." Hibbler, 693 F.3d at 1146-47 (quoting Lambert v. Blodgett, 393 F.3d

15    943, 972 (9th Cir. 2004)).  The state court's failure to hold an evidentiary hearing does not

16    automatically render its fact-finding process unreasonable.  Id. at 1147.  Further, a state court may

17    make factual findings without an evidentiary hearing if "the record conclusively establishes a fact

18    or where petitioner's factual allegations are entirely without credibility." Perez v. Rosario, 459

19    F.3d 943, 951 (9th Cir. 2006) (citing Nunes v. Mueller, 350 F.3d 1045, 1055 (9th Cir. 2003)).

20    The court looks to the last reasoned state court decision as the basis for the state court

21    judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

22    "[I]f the last reasoned state court decision adopts or substantially incorporates the reasoning from

23    a previous state court decision, [this court] may consider both decisions to 'fully ascertain the

24    reasoning of the last decision.'" Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en

25    banc) (quoting Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005)).  "When a federal claim

26    has been presented to a state court and the state court has denied relief, it may be presumed that

27    the state court adjudicated the claim on the merits in the absence of any indication or state-law

28    procedural principles to the contrary." Richter, 562 U.S. at 99.  This presumption may be

1   overcome by showing "there is reason to think some other explanation for the state court's

2   decision is more likely." Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

3   Similarly, when a state court decision on a petitioner's claims rejects some claims but does not

4   expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that

5   the federal claim was adjudicated on the merits. Johnson v. Williams, 568 U.S. 289, 293 (2013).

6   When it is clear, that a state court has not reached the merits of a petitioner's claim, the

7   deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court

8   must review the claim de novo. Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099,

9   1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

10      If a petitioner overcomes one of the hurdles posed by section 2254(d), the federal court

11   reviews the merits of the claim de novo. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir.

12   2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear

13   both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is

14   such error, we must decide the habeas petition by considering de novo the constitutional issues

15   raised."). For the claims upon which petitioner seeks to present evidence, petitioner must meet

16   the standards of 28 U.S.C. § 2254(e)(2) by showing that he has not "failed to develop the factual

17   basis of [the] claim in State court proceedings" and by meeting the federal case law standards for

18   the presentation of evidence in a federal habeas proceeding. See Cullen v. Pinholster, 563 U.S.

19   170, 186 (2011).

## ANALYSIS

21      Petitioner raises the following claims: (1) admission of character evidence violated his

22   due process rights; (2) ineffective assistance of counsel; (3) prosecutorial vouching; (4)

23   prosecutorial misconduct in argument; (5) presentation of false evidence; (6) denial of a

24   continuance and appointment of an expert violated due process; (7) failure to disclose exculpatory

25   evidence; (8) admission of prejudicial evidence violated due process; and (9) cumulative effect of

26   all errors rendered petitioner's trial fundamentally unfair.

27   ////

28   ////

1   **I. Admission of Character Evidence**

2          In his first claim, petitioner argues that the trial court's admission of his former wife

3   Marisa's testimony regarding their sexual relationship was prejudicial character evidence that

4   violated his due process rights.  He further argues that:  (1) the trial court erred by failing to give

5   the jury an instruction limiting its use of this evidence, (2) his trial attorney was ineffective for

6   failing to seek such an instruction, and (3) the prosecutor committed misconduct when she

7   referred to this evidence in argument.

8          **A.  Legal Standards for Review of State Court Evidentiary Rulings**

9          It is well established that "federal habeas corpus relief does not lie for errors of state law."

10  Estelle v. McGuire, 502 U.S. 62, 67 (1991) (citing Lewis v. Jeffers, 497 U.S. 764, 780 (1990)).

11  Thus, whether a petitioner's "due process rights were violated by the admission of evidence . . . .

12  is [usually] no part of a federal court's habeas review of a state conviction." Id.; see also Rhoades

13  v. Henry, 638 F.3d 1027, 1034 n.5 (9th Cir. 2011) ("[E]videntiary rulings based on state law

14  cannot form an independent basis for habeas relief.").

15         Nonetheless, courts have held that errors of state evidentiary law may violate due process

16  where "the evidence so fatally infected the proceedings as to render them fundamentally unfair."

17  Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991); accord Gonzalez v. Knowles, 515

18  F.3d 1006, 1011 (9th Cir. 2008).  In the context of review under 28 U.S.C. § 2254(d), however,

19  the federal court may only consider a rule that the Supreme Court has clearly established.  The

20  Supreme Court has made very few rulings regarding the admission of evidence as a violation of

21  due process."  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).  Indeed, the Supreme

22  Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence

23  constitutes a due process violation sufficient to warrant issuance of the writ."  Id. (citation

24  omitted); see also Munoz v. Gonzales, 596 F. App'x 588, 589 (9th Cir. 2015) (same).  The Ninth

25  Circuit also found no clearly established Supreme Court law that:  (1) the admission of prior bad

26  acts evidence to show a propensity to commit the crime violates due process, Flowers v. Foulk,

27  774 F. App'x 1019, 1022 (9th Cir.), cert. denied, 140 S. Ct. 379 (2019); or (2) the admission of

28  multiple hearsay violates due process, Zapien v. Davis, 849 F.3d 787, 794 (9th Cir. 2015).

There appears to be some disagreement about whether, absent a Supreme Court ruling on the specific issue – here, the admission of prior acts evidence, an analysis under the broad fundamentally unfair standard should be conducted separately.  For example, in Garnett v. Adams, 731 F. App'x 636, 638 (9th Cir. 2018), the court held:

> [The petitioner's] arguments must fail as, under the AEDPA, even if this Court were inclined to find the admission of the fire experimentation evidence so "clearly erroneous" that it rendered the trial "fundamentally unfair," we "may not permit the grant of federal habeas corpus relief" if such an admission is "not forbidden by 'clearly established Federal law.'"  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (quoting § 2254(d)(1)).

See also Zapien, 849 F.3d at 794 (same).  The court in Leinweber v. Tilton, 490 F. App'x 54 (9th Cir. 2012), took a different approach.  After recognizing the absence of any clearly established Supreme Court law regarding propensity evidence, the court considered whether the petitioner could establish that admission of the evidence rendered the trial fundamentally unfair.  490 F. App'x at 58.  In fact, the court in Leinweber specifically noted that "certain evidentiary rulings and particularly the admission of propensity evidence under certain circumstances in a trial may constitute a violation of due process and result in a fundamentally unfair trial."  Id.

**B.  State Court Opinion**

Petitioner raised this claim in his appeal.  Because the California Supreme Court denied review, the decision of the California Court of Appeal is the last reasoned decision of a state court.  The Court of Appeal held as follows:

> Defendant contends the court erred in admitting evidence of his sexual proclivities with his former wife under section 1101, subdivision (b). She was permitted to testify that he liked having anal sex while she was dressed up like a little girl. He requested that she call him "daddy," and he would spank her. In his view, Marisa's testimony about their sexual activities was not relevant to any issue under section 1101 because it was not misconduct, was between two consenting adults, and was not sufficiently similar to the alleged sexual misconduct with An. M. and Al. M..  We disagree.
>
> "'Character evidence, sometimes described as evidence of propensity or disposition to engage in a specific conduct, is generally inadmissible to prove a person's conduct on a specified occasion.'" (People v. Leon (2015) 61 Cal.4th 569, 597 (Leon ); § 1101, subd. (a).) Evidence that a person committed a crime, civil wrong, or other act may be admitted, however, to prove some other material fact, such as that person's intent or identity or motive. (Leon, at p. 597; §

10

1101, subd. (b).) We review the trial court's decision whether to admit evidence, including evidence of other crimes, civil wrongs, or other acts for abuse of discretion. (*Leon*, at p. 597.)

In this case, the trial court ruled that evidence of defendant's sexual activities with his former wife was admissible under section 1101, subdivision (b) to show intent and motive. According to the court, the evidence showed his attraction to young girls and his particular interest in anal sex as well as the buttocks area of a female. The evidence thus tended to corroborate the victims' allegations. In so ruling, the court considered the relevancy of the evidence under section 210 and found it highly relevant and that its probative value outweighed any prejudicial impact under section 352. The court did not abuse its discretion in admitting the evidence.

Contrary to defendant's position, the fact that his sexual activities with his wife were not misconduct or that Marisa consented to the acts does not render the evidence irrelevant under section 1101, subdivision (b). Although "[c]ases sometimes describe Evidence Code section 1101 [subdivision] (b) evidence as 'prior offenses' or 'prior bad acts' ... [t]he conduct admitted under Evidence Code section 1101 [subdivision] (b) need not have been prosecuted as a crime, nor is a conviction required." (*Leon*, supra, 61 Cal.4th at p. 597.) The statute instead "authorizes the admission of 'a crime, civil wrong, or other act' to prove something other than the defendant's character." (Ibid.) The only limitations are that the act must be relevant to prove a fact at issue (§ 210), and its admission must not be unduly prejudicial, confusing, or time consuming (§ 352). (Leon, at p. 597.)

Nor are we persuaded by defendant's contention that his sexual acts with Marisa, in which he directed her to dress like a young girl, wear her hair in pigtails, and call him "daddy" during anal sex, were not sufficiently similar to his misconduct with Al. M. and An. M. to show his intent to sexually molest the girls. To be admissible to prove intent, " 'the uncharged misconduct must be sufficiently similar to support the inference that the defendant " 'probably harbor[ed] the same intent in each instance.' " ' [Citation.]" (*Leon*, *supra*, 61 Cal.4th at p. 598.) That standard was met here.

Here, the evidence of defendant's routine sexual activities with Marisa showed he liked fantasizing that Marisa was not an adult, but a young girl when they had anal sex. Both Al. M. and An. M. testified that they were underage girls when defendant repeatedly rubbed his penis against their buttocks or otherwise tried to penetrate their rectums for anal sex. The evidence concerning Marisa dressed as an underage girl during sex with defendant was thus relevant to his intent to arouse himself when he did similar acts to Al. M. and An. M..

The absence of any evidence showing that defendant had the girls call him "daddy" during the molestations or that he spanked them while accosting them does not render the evidence sufficiently dissimilar for purposes of section 1101, subdivision (b). " 'The least degree of similarity (between the uncharged act and the charged

offense) is required in order to prove intent.' " (*Leon*, *supra*, 61 Cal.4th at p. 598.)

Defendant cites several out-of-state cases for the proposition that "[e]vidence of consensual sex with an adult is not relevant to whether a defendant molested a young minor child," but those decisions are not binding authority. (*Episcopal Church Cases* (2009) 45 Cal.4th 467, 490 [out-of-state decisions are not binding but may be persuasive]; *Ammerman v. Callender* (2016) 245 Cal.App.4th 1058, 1086 [out-of-state cases not binding on appellate court]; *Wilson v. Hinkle* (1977) 67 Cal.App.3d 506, 511, fn. 4 [same].) Further, none of the cases defendant cites involved a defendant accused of molesting minor victims who required his adult companion to dress up and act like a minor child while engaging in similar sexual activities.

In *Cooper v. State* (Tex.Ct.App. 1995) 901 S.W.2d 757, 760–761, for example, the mother of the two victims merely testified that she engaged in anal sex with the defendant but she did not testify that he wanted her to dress like a child while doing so. And *State v. Pullman* (Utah Ct.App. 2013) 306 P.3d 827, also cited by defendant, supports rather than undermines the trial court's rationale in admitting the disputed evidence here. In Pullman, the defendant was accused of trying to engage in anal sex with a minor victim. (*Id.* at p. 831.) The defendant's wife was permitted to testify that he asked her for anal sex, but she refused. (*Id.* at p. 836.) The court found the evidence relevant to show that he had a motive for seeking anal sex from the victim. (*Id.* at p. 838.) The evidence was not introduced merely to show the defendant desired anal sex with a consenting adult, something the prosecution conceded was not relevant "by itself" in the child abuse case, but rather to demonstrate that he had a motive for seeking out the minor victim once his wife turned him down. (*Ibid.*)

The same reasoning applies here. The fact that defendant liked to have anal sex with his wife by itself may not have been relevant to the child molestation allegations, but the evidence showed more than defendant's desire for anal sex with a consenting adult. Instead, it showed defendant's intent to sexually gratify himself while having sex with real or imagined underage partners.

The trial court did not abuse its discretion in determining that Marisa's prior act testimony was relevant to a noncharacter purpose under section 1101, subdivision (b). The trial court, then, properly admitted the evidence.

Chavez, 2017 WL 4159617, at *3-4.

### C. Analysis

Petitioner argues first that the introduction of Marisa's testimony regarding their sexual relationship was irrelevant and so prejudicial that it violated his due process rights. Petitioner contends that jurors may very well have been prejudiced against him because he and Marisa

12

1    engaged in anal sex.  However, as described above, there is no clearly established Supreme Court

2    law that propensity evidence violates the Due Process Clause, <u>Flowers</u>, 774 F. App'x at 1022, or

3    that irrelevant or overtly prejudicial evidence violates due process, <u>Holley</u>, 568 F.3d at 1101.

4    Petitioner does not show otherwise.  Accordingly, his claim should fail because he has not shown

5    the state court's decision was "contrary to or an unreasonable application of clearly established

6    Federal law" under 28 U.S.C. § 2254(d).

7            Even if petitioner may seek relief under the broad definition of a due process violation as

8    one that renders a trial fundamentally unfair, petitioner's claim should fail.  Marisa's testimony

9    about her sexual relationship with petitioner was brief.  (<u>See</u> 1 RT 304-05.)  And, while petitioner

10    makes much of the prosecutor's reference to it in her closing argument, that too was brief.  (<u>See</u> 4

11    RT 1073-74.)

12            On the other hand, the prosecution's case against petitioner was strong.  While the

13    victims' testimony varied in some respects and was, obviously, made difficult by the passage of

14    time, they testified with sufficient consistency that more than once petitioner had abused each of

15    them in the same manner - by pressing his penis against their buttocks.  (<u>See</u> An. M. testimony (1

16    RT 222-24, 229-31) and Al. M. testimony (1 RT 373-75, 379-80).)  The information each victim

17    provided in her SAFE interview reflected the same sort of similarities.  (<u>See</u> Al. M. SAFE

18    interview transcript (II CT 368, et seq.); An. M. SAFE interview transcript (II CT 427, et seq.)).

19            And, the victims' testimony and SAFE interviews were corroborated by other evidence.

20    First, Marisa and the victims testified similarly regarding how Marisa learned about the abuse.

21    Second, Marisa's testimony and doctors' records confirmed that the victims had been sick around

22    the time the victims recounted petitioner abusing them when they were home sick.  Third, Marisa

23    and her brother Anthony both testified about the incident where Anthony caused a kitchen fire –

24    an incident An. M. recalled because petitioner was abusing her when it occurred.  Fourth,

25    testimony regarding petitioner's conduct immediately after Marisa confronted him was

26    inculpatory.  Marisa testified that he asked her not to call the police.  An. M. testified that he took

27    them to dinner the following day and apologized to the girls.  Finally, petitioner's flight to

28    Mexico could very well have been interpreted by the jury as evidence of his guilt.  Given the

1   weight of the prosecution's evidence, it cannot be said that Marisa's brief testimony about

2   petitioner's sexual proclivities affected the verdict or rendered the trial fundamentally unfair.

3           With respect to petitioner's contention that the trial court should have given a limiting

4   instruction, the standard is the same.  Petitioner fails to show that the error "'so infected the entire

5   trial that the resulting conviction violates due process.'"  Estelle, 502 U.S. at 72 (quoting Cupp v.

6   Naughten, 414 U.S. 141, 147 (1973)); see also Middleton v. McNeil, 541 U.S. 433, 437 (2004);

7   Clark v. Brown, 450 F.3d 898, 904 (9th Cir. 2006)  ("On federal habeas, the issue is whether the

8   ailing instruction by itself so infected the entire trial that the resulting conviction violates due

9   process.  The burden on the habeas petitioner is especially heavy where, as here, the alleged error

10   involves the failure to give an instruction." (Internal citation and quotation marks omitted.)).

11           Nor has he shown prejudice as a result of any failure of his attorney to seek a limiting

12   instruction.  See Strickland v. Washington, 466 U.S. 668, 694 (1984) (To satisfy the prejudice

13   prong for a claim of ineffective assistance of counsel, a petitioner must show a "reasonable

14   probability that, but for counsel's unprofessional errors, the result of the proceeding would have

15   been different.").  Finally, the prosecutor cannot be charged with misconduct in presenting

16   Marisa's testimony or mentioning it in closing argument when the trial court ruled the evidence

17   was admissible.

18           Petitioner's claims regarding the admission and use of Marisa's testimony about her

19   sexual relationship with petitioner should fail.

20   **II.  Ineffective Assistance of Counsel**

21           Petitioner sets out multiple grounds of ineffective assistance of counsel.  His primary

22   allegations are that counsel:  (1) failed to present evidence to impeach Al. M.'s testimony that

23   petitioner began abusing her when she was about four years old; (2) failed to challenge Al. M.'s

24   statement that she found what appeared to be blood in her panties after petitioner had abused her;

25   and (3) failed to make a motion to challenge the information.

26           **A.  Legal Standards**

27           To succeed on a claim of ineffective assistance of counsel, a petitioner must show that (1)

28   his counsel's performance was deficient and that (2) the "deficient performance prejudiced the

1   defense." <u>Strickland</u>, 466 U.S. at 687.  Counsel is constitutionally deficient if his or her

2   representation "fell below an objective standard of reasonableness" such that it was outside "the

3   range of competence demanded of attorneys in criminal cases." <u>Id.</u> at 687-88 (internal quotation

4   marks omitted).  Prejudice is found where "there is a reasonable probability that, but for counsel's

5   unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694.  A

6   reasonable probability is "a probability sufficient to undermine confidence in the outcome." <u>Id.</u>

7   "The likelihood of a different result must be substantial, not just conceivable." <u>Harrington v.</u>

8   <u>Richter</u>, 562 U.S. 86, 112 (2011).

9          A reviewing court "need not determine whether counsel's performance was deficient

10   before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.  .

11   . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice

12   . . . that course should be followed." <u>Pizzuto v. Arave</u>, 280 F.3d 949, 955 (9th Cir. 2002)

13   (quoting <u>Strickland</u>, 466 U.S. at 697), <u>amended and superseded on other grounds</u>, 385 F.3d 1247

14   (9th Cir. 2004); <u>United States v. Ray</u>, No. 2:11-cr-0216-MCE, 2016 WL 146177, at *5 (E.D. Cal.

15   Jan. 13, 2016) (citing <u>Pizzuto</u>, 280 F.3d at 954), <u>aff'd</u>, 735 F. App'x 290 (9th Cir. 2018).

16          **B.  Failure to Impeach Al. M.'s Testimony re Prior Acts**

17          Petitioner argues his trial attorneys should have sought to present evidence to undermine

18   Al. M.'s testimony that petitioner abused her when she was about four years old and residing at

19   petitioner's grandmother's house.  Petitioner contends that records from Child Protective Services

20   show that Al. M. resided with her mother between the time she was four and seven.  In addition,

21   petitioner provides a declaration from his grandmother, Gloria Chavez, that Al. M. never lived

22   with petitioner when he lived in a room in her garage.  Finally, petitioner argues that counsel

23   should have used the fact that he was incarcerated when Al. M. was four years old to further

24   impeach her testimony.

25          **1.  State Court Opinion**

26          Petitioner raised this issue of ineffective assistance of counsel on appeal.  Because the

27   California Supreme Court denied review, the opinion of the California Court of Appeal is the last

28   reasoned decision of a state court.  After citing the <u>Strickland</u> standards, the Court of Appeal held

1   that whether or not counsel's conduct was reasonable in failing to object, petitioner failed to

2   establish prejudice.  The court reasoned:

> Defendant concedes the evidence of uncharged sexual acts with Al. M. was relevant and therefore admissible under section 1108. That statute provides an exception to the general rule in section 1101 that character evidence is not admissible to prove propensity. (*People v. Falsetta* (1999) 21 Cal.4th 903, 911 ["the Legislature enacted section 1108 to expand the admissibility of disposition or propensity evidence in sex offense cases"].) "Subdivision (a) of that section provides in pertinent part that 'In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352 [permitting court to exclude evidence on weighing probative value and prejudicial impact].' " (*Ibid.*; *People v. Escudero* (2010) 183 Cal.App.4th 302, 306 (*Escudero* ) [such evidence is presumed to be admissible to assist the trier of fact in evaluating the credibility of the victim and the defendant]; § 1108, subd. (a).)
>
> Section 352, in turn, provides a "court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.) The prejudice referred to in section 352 is not the prejudice to a defendant that naturally flows from probative evidence tending to demonstrate guilt of a charged offense, but rather the prejudice resulting from " 'evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging." ' [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 638; *see also Escudero, supra*, 183 Cal.App.4th at p. 310 [evidence should be excluded under § 352 when it is of such nature as to inflame the emotions of the jury].)
>
> Trial courts exercise discretion in determining the admissibility of evidence under section 352. (*People v. Ochoa* (2001) 26 Cal.4th 398, 437, *disapproved on other grounds in People v. Prieto* (2003) 30 Cal.4th 226, 263, fn. 14.) Reversal is warranted only when " ' "the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Ochoa*, at pp. 437–438.)
>
> Here, defendant argues Al. M.'s testimony that he put his fingers in her vagina, rubbed against her with his erect penis, and touched her buttocks when she was approximately four years old was inherently prejudicial because it involved acts against a young child, and the testimony, in his view, was false. Such evidence, he contends, " 'uniquely tend[ed] to evoke an emotional bias against ... defendant as an individual ....' " We disagree.

28   ////

16

The uncharged-acts evidence was no more inflammatory than the evidence concerning the charged offenses. (*People v. Falsetta*, *supra*, 21 Cal.4th at pp. 908, 924 [evidence of two prior rapes was not more inflammatory when compared with charged offenses, including forcible oral copulation and assault with intent to rape].) Indeed, the conduct was similar to what Al. M. testified defendant had done to her when she was eight or nine years old, which was the basis of the charges. (*Escudero, supra*, 183 Cal.App.4th at p. 311 [uncharged acts against two adult victims shared significant similarities with molestations of minor victim].) We seriously doubt that the jury was somehow more inflamed upon learning defendant had molested his own daughter when she was four as opposed to when she was nine.

We also reject defendant's contention that Al. M.'s testimony about the uncharged prior acts was patently false. Because Al. M. was his biological daughter, and not his stepdaughter, the jury could reasonably infer that he would have had access to her before he ever met or married Marisa. Al. M., moreover, candidly testified that she was not sure of her exact age when she began living with defendant. Although she estimated that she might have been four years old, she did not definitively testify to being that age when the uncharged molestations occurred. His contention that other evidence in the record shows he was incarcerated when she was four years old thus does not contradict her testimony or otherwise prove that it was false.

Given the totality of the evidence presented, we cannot say the court's exercise of discretion to admit the evidence was either arbitrary or capricious. The evidence of uncharged sexual molestations of Al. M. before she was nine years old shared significant similarities with the charged molestations, and was thus highly probative as to defendant's guilt. The evidence was not remote in time, nor more inflammatory than the charged offenses. The trial court properly exercised its discretion in allowing Al. M. to testify to the uncharged prior acts under sections 1108 and 352.

Chavez, 2017 WL 4159617, at *5-6.

**2. Was the State Court Opinion Contrary to or an Unreasonable Application of Clearly Established Federal Law?**

The California Court of Appeal rejected this claim on the grounds that even if counsel acted unreasonably, petitioner failed to establish prejudice.  This court agrees.  Even if all of petitioner's evidence is accepted as true, petitioner fails to demonstrate that the Court of Appeal's decision was unreasonable.

Al. M. testified that she started living with petitioner when she was about four years old in the room in his grandmother's garage.  During that time, petitioner abused her by, among other things, rubbing his penis against her buttocks.  (1 RT 366-75.)  The evidence petitioner now

17

1    presents would not have caused the jury to disbelieve Al. M.  First, while Al. M. testified that she

2    "lived" with petitioner, she did not testify that she was there every night.  Marisa testified that

3    when she and petitioner lived in the room in his grandmother's garage, in about 2003, Al. M.

4    would visit them on weekends.  (1 RT 279-81.)  The jury could very well have understood Al.

5    M.'s testimony to be that she stayed with petitioner sometimes, not that she lived with him full-

6    time.

7         With respect to petitioner's argument that his attorneys should have presented evidence

8    that he was incarcerated when Al. M. was four years old, Al. M. did not testify with certainty

9    about her age.  She testified that she was "not sure about the exact age.  I'm thinking four."  (1

10   RT 366.)  Petitioner does not contend that he was incarcerated after the time Al. M. was four.  In

11   fact, in his traverse, petitioner states that he was released when Al. M. was five years old.  (ECF

12   No. 20 at 38.)  Any impeaching effect of evidence that he was incarcerated when Al. M. was four

13   would have been minimal, at best.

14        To establish prejudice under <u>Strickland</u>, petitioner must show a reasonable probability

15   that, had his attorneys acted reasonably, the result of the proceedings would have been different.

16   Petitioner fails to make that showing with respect to his attorneys' failure to challenge Al. M.'s

17   testimony regarding abuse when she was about four to seven years old.  The Court of Appeal's

18   determination that petitioner had not shown prejudice was not contrary to, or an unreasonable

19   application of, the clearly established <u>Strickland</u> standard.

20        **C.  Failure to Challenge Statement re Blood on Panties**

21              **1.  Background**

22        In her SAFE interview played for the jury, Al. M. said she once found "red stuff" in her

23   panties after petitioner abused her.  (II CT 403, 411.)  She changed out of the panties and then

24   could not find them.  She thought petitioner had taken them and thought she saw them later near

25   the dogs' bed.  (II CT 412.)  That was the extent of the evidence heard by the jury regarding

26   possible blood in Al. M.'s panties.

27   ////

28   ////

18

1   Shortly after Marisa contacted the police, An. M.'s grandmother, Anna Moreno, found a

2   pair of girl's panties in the dogs' bed.  The panties appeared to have blood stains.  Ms. Moreno

3   gave the panties to the police.

4   The stains were analyzed by two government criminalists.  They testified outside the

5   jury's presence.  Devin Johnson first tested the panties.  She found no human DNA in the stains,

6   but found some canine DNA.  She was unable to determine, however, whether the stains were

7   human blood or canine blood or not blood.  (II RT 666-67.)  Johnson felt the stains were likely

8   blood but did not feel she could opine about whether it was human blood.  (II RT 667.)  She also

9   found three sperm in the panties that, based on her visual inspection of it, was human.  (II RT

10  665-66, 684-85, 687, 695-96.)  However, she further testified that the few sperm found, without

11  any indication of seminal fluid on the panties, could indicate that the sperm had been on other

12  clothing that were washed with the panties.  (II RT 698.)  Johnson testified that she was unable to

13  obtain sufficient information to create a DNA profile for the sperm.

14  Criminalist Ann Murphy next examined the samples.  She testified that she found a major

15  contributor to the sperm and a minor contributor.  She was able to obtain a partial DNA profile

16  for the major contributor.  She testified that this profile "was consistent with the reference

17  profile from" petitioner.  (III RT 706.)

18  Out of the jury's presence, the trial court held a hearing pursuant to California Evidence

19  Code § 402 to determine whether the defense could present Johnson's testimony while barring the

20  prosecution from presenting Murphy's.  Johnson and Murphy testified at the 402 hearing as set

21  out above.  The court ruled that it would not permit the defense to introduce some evidence

22  without allowing all of it.  (III RT 729.)

23  **2. State Court Opinion**

24  Petitioner first raised this claim in his motion for a new trial.  He argued that his trial

25  attorneys were ineffective for failing to challenge Al. M.'s statement in her SAFE interview that

26  once after petitioner abused her, she found blood in her panties.  (See II CT 578.)  The trial court

27  found that the evidence petitioner sought to present was more prejudicial than helpful to him.

28  Therefore, the trial court found petitioner failed to establish prejudice from any errors of counsel.

19

1   (IV RT 1336-37.)  Because petitioner raised this claim before the California Supreme Court on

2   habeas, the last reasoned decision of a state court is the trial court's determination.

3   **3. Was the State Court's Decision Contrary to or an Unreasonable**

4   **Application of Clearly Established Federal Law?**

5   Petitioner makes two arguments.  First, he contends his attorneys should have made a

6   better case for presenting Johnson's testimony while excluding Murphy's DNA testimony.

7   Second, petitioner argues that counsel should have hired an expert to test the panties.  According

8   to petitioner, had counsel had the panties analyzed by an independent expert, that testing would

9   have shown that the stains on the panties were canine blood.

10   With respect to petitioner's first argument, petitioner fails to establish prejudice.  Even if

11   defense counsel had made a better, and successful, attempt to exclude Murphy's testimony, this

12   court finds no reasonable probability that introduction of Johnson's testimony would have

13   favorably affected the verdict.  Johnson's testimony was not conclusive – she could not determine

14   with certainty that it was human blood and she detected some canine DNA.  However, the

15   presence of canine DNA was consistent with Al. M's statement at her SAFE interview that she

16   last saw the panties in the dogs' bed.  Further, Johnson's testimony that she found sperm on the

17   panties would very likely have counterbalanced any benefit from Johnson's testimony regarding

18   the blood.  Even if there was another explanation for the presence of the sperm, the fact that it

19   was found on girls' panties was prejudicial to the defense.  Given the prosecution's strong case,

20   and given the weak value, if any, of Johnson's testimony, petitioner was not prejudiced by any

21   failure of his attorneys to impeach Al. M. with Johnson's testimony.

22   With respect to petitioner's second argument, he points to a report by Forensic Analytical

23   Sciences ("FAS").  Defense counsel had requested the report.  It was dated November 17, 2015,

24   the day after the 402 hearing was held.  (III CT 704; II RT 632.)  The forensic scientists who

25   completed the FAS report had reviewed Johnson and Murphy's reports, their written data, and

26   their testing results.  FAS did not have access to the fabric samples themselves.

27   The FAS report first concluded that the presence of sperm on the panties did not indicate

28   the presence of semen.  Rather, the scientists felt the few sperm found was more indicative of the

20

transfer of sperm to the panties from another item of clothing in the wash.  (III CT 708.)  Second, the scientists opined that the absence of human DNA in the stains meant they "cannot be characterized as or assumed to be human blood."  (III CT 711, 714.)  Finally, the scientists challenged Murphy's methods, and, on that basis, rejected her conclusion of a possible DNA match.  (III CT 715-18.)

Petitioner argues that his attorneys should have sought a review of the government's forensic analysis of the panties prior to trial.  Had they received that report then, petitioner continues, the attorneys could have "followed the lead" of the FAS report and sought to test the fabric samples to "confirm the blood on the panties was canine blood."

Whether or not petitioner's attorneys acted reasonably, petitioner again fails to show prejudice.  First, the FAS report was not dissimilar to Johnson's testimony.  Both found the blood could not be categorized as either animal or human.  And, both agreed that the few sperm found on the panties could have come from a transfer in the wash.  For the reasons set forth above, any failure of counsel to attempt to introduce the panties and then present the testimony of the FAS scientists was not prejudicial to petitioner.  Further, petitioner has presented nothing to establish that the stains on the panties were canine blood.  He fails to show that had counsel had the panties tested further, the results would have been favorable.  The trial court's determination that petitioner's ineffective assistance of counsel claim failed because he could not establish prejudice was not contrary to or an unreasonable application of clearly established federal law.

Petitioner's claim of ineffective assistance of counsel for the failure to do more to impeach Al. M.'s statement that she found "red stuff" in her panties should be denied.

**D.  Failure to File 995 Motion**

Petitioner alleges that he told trial counsel "that the charges did not match the original information and that they were different charges and different time frames and acts relating to [Al. M.]."  Petitioner argues counsel should have filed a motion under California Penal Code § 995 to dismiss the information.  However, petitioner makes no further argument on this point.

Again, petitioner fails to establish prejudice.  He does not demonstrate that had a § 995 motion been made, there is a reasonable probability the result of the proceedings would have been

different.[2]  The California Supreme Court's denial of this claim on habeas was not contrary to or an unreasonable application of clearly established federal law.

### E.  Other Ineffective Assistance Arguments

Petitioner argues generally that his attorneys failed to conduct investigations prior to trial, had a conflict of interest, and failed to call alibi witnesses.  However, besides the issues raised above, he does not identify any other specific evidence or witnesses counsel failed to uncover and fails to explain any conflict of interest.  Petitioner further argues that counsel failed to "protect [his] constitutional right to testify."  Again, petitioner fails to support his conclusory statement with any specific description of what counsel did or did not do; nor does he show how he was prejudiced by this supposed failure.[3]

In sum, petitioner fails to establish he was prejudiced by any of counsel's failures, whether considered individually or cumulatively.  The prosecutor's case was strong – supported by the SAFE interviews of two young girls and their testimony, which was largely consistent, ten years later.  Petitioner's ineffective assistance of counsel claims should fail.

## III.  Prosecutorial Vouching

Petitioner claims that the prosecutor improperly vouched for the truthfulness of the victims' testimony when she argued in closing that they had "no reason to lie."

### A.  Legal Standards

Vouching occurs when the prosecution places the prestige of the government behind a witness through personal assurances of the witness's veracity.  See United States v. Weatherspoon, 410 F.3d 1142, 1147 (9th Cir. 2005); United States v. Necoechea, 986 F.2d 1273, 1276 (9th Cir. 1993).  It may also take the form of witness testimony that bolsters the credibility of a witness.  In particular, an expert may not testify in a manner that buttresses the credibility of

---

[2]  This court finds it unlikely any § 995 motion on the grounds petitioner indicates would have been granted.  California law permits conviction for child molestation based on "generic" testimony regarding the kind and number of acts committed and the general time period during which the conduct occurred.  See People v. Jones 51 Cal.3d 294, 313-314, 316 (1990).

[3] To the extent petitioner is referring to the claim regarding the trial court's decision to permit petitioner to be impeached with a evidence of a juvenile crime, that claim is discussed below.

a witness.  United States v. Rivera, 43 F.3d 1291, 1295 (9th Cir. 1995) (quoting United States v.

Brodie, 858 F.2d 492, 496 (9th Cir. 1988), overruled on other grounds in United States v.

Morales, 108 F.3d 1031 (9th Cir. 1997)).  The Ninth Circuit has explained the rule as follows:

"'[an] expert witness is not permitted to testify specifically to a witness's credibility or to testify

in such a manner as to improperly buttress a witness's credibility.'"  Id. (quoting United States v.

Candoli, 870 F.2d 496, 506 (9th Cir. 1989)).  Vouching is "especially problematic in cases where

the credibility of the witnesses is crucial."  United States v. Molina, 934 F.2d 1440, 1445 (9th Cir.

1991).

The issue of prosecutorial vouching, or expert testimony that bolsters witness credibility,

was considered by the Ninth Circuit in the cited cases above in light of Federal Rules of

Evidence.  There is no indication federal courts have considered these specific issues as a matter

of constitutional error.  Cf. United States v. Valle-Valdez, 554 F.2d 911, 915-16 (9th Cir. 1977)

("Errors in such matters as jury instructions, rulings on the admissibility of evidence where

Fourth Amendment claims are not involved, and comments by counsel generally have been

considered "nonconstitutional.").  Where there is no specific constitutional prohibition on

vouching, and when prosecutorial misconduct does not violate a specific constitutional guarantee,

it warrants federal habeas relief only if the conduct complained of rises to the level of a due

process violation.  Darden v. Wainwright, 477 U.S. 168 (1986); Greer v. Miller, 483 U.S. 756

(1987).[4]

The standard for a due process violation is whether the conduct complained of "so

infected the trial with unfairness as to make the resulting conviction a denial of due process."

Darden, 477 U.S. at 181 (citing Donnelly v. DeChristoforo, 416 U.S. 637, 642-43 (1974))

(internal citations and quotation marks omitted).  "[T]he touchstone of due process analysis ... is

the fairness of the trial, not the culpability of the prosecutor."  Smith v. Phillips, 455 U.S. 209,

---

[4] Some courts have simply held that claims that expert testimony improperly bolstered witness
credibility are not cognizable on federal habeas review.  Diaz v. Greiner, 110 F. Supp. 2d 225,
234 (S.D. N.Y. 2000); see also Van Cleave v. White, No. 2:07-CV-11899, 2009 WL 6047143, at
*6 (E.D. Mich. Dec. 7, 2009) (citing Diaz), rep. and reco. adopted, 2010 WL 973479 (E.D. Mich.
Mar. 16, 2010).

1   219 (1982).  In determining whether the vouching or bolstering was so egregious as to warrant

2   habeas relief, a court should consider review the trial record and consider, among other things, the

3   following factors:

> the form of vouching; how much the vouching implies that the
> prosecutor has extra-record knowledge of or the capacity to monitor
> the witness's truthfulness; any inference that the court is monitoring
> the witness's veracity; the degree of personal opinion asserted; the
> timing of the vouching; the extent to which the witness's credibility
> was attacked; the specificity and timing of a curative instruction; the
> importance of the witness's testimony and the vouching to the case
> overall.

9   United States v. Combs, 379 F.3d 564, 575 (9th Cir. 2004) (quoting Necoechea, 986 F.2d at

10  1278).

11      **B.  Was the State Court's Decision Contrary to or an Unreasonable Application of**

12  **Clearly Established Federal Law?**

13      Because petitioner raised this claim in his state habeas petition, the court considers

14  whether there is any reasonable basis for the California Supreme Court to have denied the claim.

15  Whether or not the Supreme Court has clearly established that prosecutorial vouching may violate

16  the Due Process Clause, petitioner simply fails to establish that the prosecutor's comments

17  amounted to vouching.  The prosecutor was not assuring the victims' veracity, United States v.

18  Wright, 625 F.3d 583, 611 n. 15 (9th Cir. 2010) ("In the usual case of vouching, the prosecutor

19  does not merely give his impressions of the defendant's case, or highlight his own experience;

20  rather, he explicitly assures the government witnesses' veracity." (citations omitted)); nor was the

21  prosecutor implying that there was evidence not presented to the jury that would validate the

22  victims' testimony, Necoechea, 986 F.2d at 1276 (prosecutor may not "suggest[] that information

23  not presented to the jury supports the witness's testimony").  Rather, the prosecutor examined the

24  record before the jury to support her argument that nothing in the record showed the victims had a

25  motive to concoct such stories about petitioner.  (See IV RT 1083-84.)  This is an appropriate tact

26  in argument.  See Weatherspoon, 410 F.3d at 1166 (argument that witnesses had nothing to gain

27  by lying did not constitute improper vouching); United States v. Nash, 115 F.3d 1431, 1439 (9th

28  Cir. 1997).  Petitioner's vouching claim should fail.

**IV.  Prosecutor's Criticism of Defense Counsel**

Petitioner argues that the prosecutor committed misconduct in closing argument when she essentially called his counsel, and by extension him, a liar.  (ECF No. 2 at 47.)  During her closing, the prosecutor argued:

> First of all, rest assured I'm not going to go over every single point that [defense counsel] made and dispute that. It is obvious what we disagree on most things in this case. I am going to say his last comment about Anna Moreno was absolutely improper and under-handed.
>
> There was another argument he made to you regarding a prior criminal conviction of this man. There are rules of evidence that allow certain evidence and disallow certain evidence, and he knows that.
>
> And for him to slide that in is under-handed. It is sneaky. And it is improper, and it just goes to show what kind of case they are putting on.

(IV RT 1181.)  Defense counsel's objection was sustained.  (Id.)

Petitioner raised this claim in his state habeas petition.  The California Supreme Court denied it without comment.

**A.  Legal Standards**

When considering the constitutionality of a prosecutor's argument, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  Darden, 477 U.S. at 181 (quoting Donnelly, 416 U.S. at 642-43).  "[T]he touchstone of due process analysis ... is the fairness of the trial, not the culpability of the prosecutor."  Smith, 455 U.S. at 219.

**B.  Was the State Court's Decision Contrary to or an Unreasonable Application of Clearly Established Federal Law?**

Whether or not the prosecutor's comments were improper, they did not "infect the trial with unfairness."  First, the prosecutor's comments must be taken in context.  The specific comments were directed at objectionable arguments made by defense counsel.  See Darden, 477 U.S. at 182 ("the idea of invited response is used not to excuse improper comments, but to determine their effect on the trial as a whole" (internal citation and quotation marks omitted)).

25

1    The prosecutor's reference to Anna Moreno was made in response to defendant's

2    counsel's prior argument in which he asked, "And lastly is why haven't we heard from Anna

3    Moreno?"  (IV RT 1180.)  The prosecutor's objection to that statement was sustained.  (Id.)

4    With respect to the prosecutor's reference to argument regarding a prior conviction,

5    defense counsel had attempted to cast doubt on Marisa's testimony that petitioner told her he

6    could not get a business license for an escort service because he had a prior conviction.  Defense

7    counsel noted that there was "no other evidence . . . presented" of this prior conviction.  (IV RT

8    1155.)  The prosecutor's objection to that statement was sustained as well.

9    This court must consider "the probable effect the prosecutor's response would have on the

10   jury's ability to judge the evidence fairly.  In this context, defense counsel's conduct, as well as

11   the nature of the prosecutor's response, is relevant."  United States v. Young, 470 U.S. 1, 12

12   (1985) (citation omitted).  The prosecutor's remarks regarding Moreno and the prior conviction

13   were invited by defense counsel's improper argument and, as such, would have had little, if any,

14   prejudicial effect on the jury.

15   The same is true for the prosecutor's characterization of defense counsel's comments as

16   "under-handed" and "sneaky."  This was obviously colorful language that referred back to the

17   Moreno and prior conviction comments.  While the prosecutor's further argument that defense

18   counsel's comments were indicative of "the kind of case they are putting on" went beyond mere

19   responsiveness, defense counsel's objection to that comment was sustained.   And the jury was

20   later instructed that:  "[n]othing that the attorneys say is evidence.  In their opening statements

21   and closing arguments the attorneys discuss the case but their remarks are not evidence."  (IV RT

22   1190.)  The jury was also instructed:

> Do not assume that something is true just because one of the
> attorneys asked the question that suggested it was true.  During the
> trial, the attorneys may have objected to questions or moved to strike
> answers by the witnesses. I ruled on the objections according to the
> law.

> If I sustained an objection, you must ignore the question. If the
> witness was not permitted to answer do not guess what the answer
> might have been or why I ruled as I did.

28   ////

1

> If I ordered testimony stricken from the record, you must· disregard it and must not consider that testimony for any purpose.

2

3    (Id.)

4        Given the strength of the prosecution's case and the obviously argumentative nature of the

5    prosecutor's comments, this court finds no reasonable possibility those comments led the jury to

6    discount the defense evidence.  The state court's rejection of this claim was not contrary to or an

7    unreasonable application of clearly established federal law.

8    **V.  Presentation of False Evidence**

9        Petitioner contends the prosecution knew, or should have known, that Al. M.'s testimony

10   that petitioner started abusing her when she was four years old was false and that her testimony

11   that she was living with petitioner at that time was also false.  Petitioner raised this claim in his

12   state habeas petition, which was denied without comment.

13       **A.  Legal Standards**

14       A conviction obtained through the use of false evidence violates a defendant's due process

15   rights.  Napue v. Illinois, 360 U.S. 264, 269 (1959).  This is true whether the prosecutor knew the

16   evidence was false or should have known it was false.  United States v. Agurs, 427 U.S. 97, 103

17   (1976).  The false evidence must have been material.  Evidence is not material if "the false

18   testimony could not in any reasonable likelihood have affected the judgment of the jury."  Napue,

19   360 U.S. at 271; Giglio v. United States, 405 U.S. 150, 154 (1972).

20       **B.  Was the State Court's Decision Contrary to or an Unreasonable Application of**

21   **Clearly Established Federal Law?**

22       Petitioner claim should fail because he does not establish that Al. M.'s testimony was

23   false.  Al. M. did not testify that she was, in fact, abused at the age of four.  Rather, she testified

24   that she thought she was about four years old.  (I RT 372.)  Similarly, she testified that she

25   thought she was about four when she lived with petitioner in her grandmother's garage.  (I RT

26   366-67.)  Because Al. M.'s testimony was uncertain regarding the time period, it cannot be said

27   that it was false.

28   ////

1    With respect to Al. M.'s statement that she "lived" with petitioner around that time, as

2    discussed above, while she may not have lived there full-time, the evidence showed she spent

3    time at petitioner's home when he lived in his grandmother's garage.  Moreover, whether or not

4    Al. M. "lived" with petitioner was not material.  Its value as impeachment for a teenager's

5    memory of where she resided as a young girl was minimal.  In addition, it had no value on its

6    own.  It was only relevant to any question whether Al. M. spent time with petitioner when she

7    was very young.  Petitioner does not contend that after he was released from prison when Al. M.

8    was five years old, he did not spend any time with Al. M.

9    Petitioner fails to show the state court's denial of this claim was contrary to or an

10   unreasonable application of clearly established federal law.  Petitioner's claim that the prosecutor

11   presented false evidence should be denied.

12   **VI.  Denial of Continuance**

13   Petitioner states that "during trial" the trial judge denied a defense request for a

14   continuance to test the stained panties.  (ECF No. 2 at 33.)  He also states that the judge told

15   defense counsel they could use the prosecutor's experts if they wished.  Petitioner provides no

16   further information about this claim and respondent does not appear to address it in the answer.

17   Petitioner cites Ake v. Oklahoma, 470 U.S. 68 (1985) in support of this argument.  (ECF No. 2 at

18   33.)

19   It is unclear when petitioner contends this request occurred.  This court is unable to find a

20   formal motion for a continuance made during trial.  However, after the 402 hearing, defense

21   counsel did request a continuance.  The purpose of that request was not to obtain an expert to test

22   the panties; rather, the purpose was to attempt to get the testimony of Anna Moreno.  The defense

23   appeared to be attempting to show that she coached the victims prior to their SAFE interviews.

24   Defense counsel also wanted to be able to point out that Ms. Moreno located the panties and

25   provided them to the police right before those interviews.

26   In any event, assuming that during the course of trial petitioner's counsel requested, and

27   was denied, a continuance and the funding to hire an expert to test the panties, petitioner cannot

28   succeed on this claim.  First, as the Ninth Circuit has pointed out, it is not clear Ake applies in this

1  situation.  Alsborg v. Swarthout, 654 F. App'x 883, 885 (9th Cir. 2016).  The Court in Ake held

2  that an indigent criminal defendant is entitled to the appointment of a psychiatrist at state expense

3  where his sanity is at issue.  470 U.S. at 87.  Assuming Ake applies to the appointment of a

4  forensic expert in the present case, the standard is whether "the defendant has shown that

5  appointment of the expert is necessary to address a disputed issue."  Alsborg, 654 F. App'x at

6  885.

7        As described above in the discussion of petitioner's ineffective assistance of counsel claim

8  on this issue, petitioner fails to show he was prejudiced by any failure to further test the panties.

9  Petitioner provides no basis for counsel to have challenged criminalist Johnson's determinations

10  that canine DNA but no human DNA was present in the stains, the stains could not be

11  conclusively determined to be either canine or human blood, and sperm was found on the panties.

12  Petitioner fails to show that any denial of motions for a continuance and appointment of an expert

13  resulted in a violation of his due process rights.

14  **VII.  Brady Violation**

15        Petitioner contends the prosecution failed to honor its duty to provide the defense with

16  exculpatory evidence when it provided the defense with criminalist Murphy's "false and

17  misleading" evidence.  (ECF No. 2 at 35.)

18        **A.  Legal Standards**

19        The due process clauses of the Fifth and Fourteenth Amendments to the Constitution, as

20  interpreted by the United States Supreme Court in Brady v. Maryland, require the prosecution to

21  learn of and disclose to the defense any exculpatory or impeachment evidence favorable to the

22  accused that is in the prosecution's possession.  Brady v. Maryland, 373 U.S. 83, 87 (1963).

23  Brady places an affirmative duty on the prosecutor to seek out information in the government's

24  possession that is favorable to the defendant.  Kyles v. Whitley, 514 U.S. 419, 437 (1995); United

25  States v. Price, 566 F.3d 900, 908-09 (9th Cir. 2009).  However, the government has no

26  obligation to "single out" particular pieces of exculpatory evidence that are beneficial to the

27  defendant.  Rhoades v. Henry, 638 F.3d 1027, 1039 (9th Cir. 2011).

28  ////

"[S]trictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."  Strickler v. Greene, 527 U.S. 263, 281 (1999).  When making a claim under Brady, the burden of proving the need for disclosure is on the defendant.  United States v. Sai Keung Wong, 886 F.2d 252, 256 (9th Cir. 1989).  "The mere suspicion that information will prove helpful is insufficient to require disclosure."  Id.

**B.  Was the State Court's Decision Contrary to or an Unreasonable Application of Clearly Established Federal Law?**

Because petitioner raised this claim in his state habeas petition, the court considers whether there is any reasonable basis for the California Supreme Court to have denied the claim.  First, to the extent petitioner is alleging Murphy's report was not provided to the defense in a timely manner, he provides no support for that allegation.  Second, to the extent petitioner is alleging Murphy's report was false, the trial court addressed that issue when it denied petitioner's motion for a new trial.  In its opposition to the motion, the government provided a declaration from Murphy in which she explained that any confusion regarding her report and testimony was the result of an error in describing her testing method.  In fact, as the trial judge recognized, had Murphy been permitted to testify at trial, she could have explained the discrepancy satisfactorily and he would not have excluded her DNA testing results based on the error.  (IV RT 1333-34.)

In sum, the prosecution did not knowingly provide the defense with false information in the form of Murphy's report.  Petitioner's claim should be denied.

**VIII.  Admission of Evidence**

Petitioner alleges the trial court erred in:  (1) admitting Marisa's testimony that petitioner failed to respond to An. M.'s challenge that he should take a lie detector test; and (2) permitting petitioner to be impeached with evidence of a crime he committed while a juvenile.  The legal standards for these claims are set out above in the discussion of claim I.

////

////

////

30

**A. Lie Detector Testimony**

**1. Background Facts**

The Court of Appeal described the admission of the lie detector evidence at trial as

follows:

> [O]n direct examination Marisa testified that on the night they confronted defendant about the molestation accusations, An. M. told him she could take a lie detector test and she questioned whether he could do the same. Defendant did not respond verbally, but instead hung his head in his hands. An. M., however, testified that she did not confront defendant when he returned home because Marisa had already made her go upstairs to her bedroom. She stayed there until the next day when she went to school.
>
> During closing arguments, the prosecutor made a single reference to An. M.'s purported statement questioning whether defendant could take a lie detector test and his silence following the statement. Defense counsel in closing pointed out the inconsistency between Marisa's and An. M.'s testimony concerning whether An. M. ever made the lie detector test statement to defendant.

Chavez, 2017 WL 4159617, at *7.

**2. State Court Opinion**

The California Court of Appeal considered this issue on appeal.  It concluded that the

admission of the lie detector comment was error because it violated California Evidence Code §

351.1(a).  It went on to hold that the error was harmless for the following reasons:

> Although we agree error occurred, we are persuaded, under the circumstances of this case, that the error was not prejudicial. The instant case is readily distinguishable from *Schiers*, *Basuta*, and *Carter*, the cases upon which defendant primarily relies.
>
> In *Schiers*, a police officer testified he repeatedly told the defendant that the lie detector test indicated he was lying about his wife's murder. The court struck the testimony and instructed the jury to disregard it. Applying the *Watson* prejudicial error standard, the *Schiers* court held that the error in allowing the polygraph testimony constituted prejudicial error, noting: " ' "[W]here the case is closely balanced and guilt has not been so clearly established as to render it improbable that the harmful effect of the misconduct may have turned the scales against the accused, such misconduct has consistently been deemed ground for reversal ...." ' " (*Schiers, supra*, 19 Cal.App.3d at p. 109, italics omitted.)
>
> In *Basuta*, the prosecution's key witness offered to take a polygraph test after accusing the defendant daycare provider of shaking a baby to death. (*Basuta, supra*, 94 Cal.App.4th at pp. 388–390.) The witness had originally told officers that the baby had fallen. (*Id.* at

31

pp. 379–380.) The court concluded that the improper mention of the offer to take a polygraph test, in combination with the critical error in excluding evidence that the baby's mother had previously jerked or shaken the child, was prejudicial. (*Id.* at p. 391.)

In *Carter*, an important suspect in the murder case said that he would be willing to take a lie detector test; he also said that some other people would not take such a test. (*Carter, supra*, 48 Cal.2d at p. 752.) Although the court struck the statement regarding other people, the court allowed the suspect's statement that he would be willing to take a lie detector test to stand. (*Ibid.*) The appellate court concluded this was error because the implication survived that the defendant had refused to take a lie detector test and that his refusal furnished some evidence of guilty knowledge. (*Ibid.*) In light of the numerous other errors the court found occurred during trial (*id.* at pp. 748–749, 754–755, 757, 759), and the closeness of the proof, the court concluded that "absent these errors the jury might have reached a different verdict." (*Id.* at p. 759.)

In each of the above cases, the proof was close or the polygraph error occurred in combination with other significant trial errors. That is not what occurred here. This was not a close case and defendant's other claims of error are without merit.

At the outset, we note that An. M. essentially denied that she ever confronted defendant about his willingness to take a lie detector test. According to her, Marisa sent her to her room before defendant returned home, and she stayed in her room until the next day when she left for school. Her testimony, then, directly contradicted Marisa's claim that An. M. mentioned a lie detector test to defendant thus weakening the impact of the disputed statement.

Both Al. M. and An. M., moreover, testified to the sexual abuse they suffered from defendant. The testimony of each tended to corroborate the testimony from the other. Both girls were close in age and both girls revealed that defendant had rubbed his erect penis against their buttocks.

Their SAFE interviews, taken shortly after they disclosed the abuse, were also played for the jury. Their trial testimony and the disclosures made during the SAFE interview six years earlier were generally consistent. The testimony from these key witnesses was compelling.

Although the prosecutor made a single reference to the lie detector statement in her closing argument to the jury, as defense counsel repeatedly noted, the prosecutor's primary focus during closing was on the credibility of the SAFE interviews. Defense counsel told the jury, "During her entire argument she focused on—and the evidence that was presented in the SAFE interviews. Those interviews by forensic experts that know how to conduct these, to not ask leading questions, to not suggest things. They are trained to do so. And that was her focus during her whole argument."

////

32

The evidence also showed that when first confronted with the sexual abuse accusations, defendant did not deny the conduct but rather told Marisa not to call the cops because he did not want to go back to jail. While Marisa said defendant did eventually deny the allegations, the evidence also showed that the following day defendant and Marisa took the girls to a restaurant after school where defendant apologized to the girls. The jury reasonably could have found that defendant's failure to immediately deny the allegations constituted an adoptive admission of their truth. (§ 1221 ["Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth"; *People v. Riel* (2000) 22 Cal.4th 1153, 1189 [" 'When a person makes a statement in the presence of a party to an action under circumstances that would normally call for a response if the statement were untrue, the statement is admissible for the limited purpose of showing the party's reaction to it. [Citations.] His silence, evasion, or equivocation may be considered as a tacit admission of the statements made in his presence.' "].) His subsequent apology also tended to show a consciousness of guilt over his actions.

Most telling, however, is defendant's flight from the country after he learned that Marisa had called the police to report the abuse. Defendant absconded to Mexico for nearly six years, working under an alias so as to conceal his true identity. Before he left, defendant apologized to Marisa. Where, like here, a defendant has departed a crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt, a jury may properly consider such flight in deciding whether the defendant is guilty of the crimes charged. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1054.)

Given the dispute over whether An. M. even made the lie detector statement, and the overwhelming evidence of defendant's guilt, we conclude it is not reasonably probable defendant would have received a more favorable outcome at trial had the lie detector testimony been excluded. (*Watson, supra*, 46 Cal.2d at p. 836.) We also reject defendant's contention that the error was prejudicial under *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705].)

Chavez, 2017 WL 4159617, at *7-9 (footnotes omitted).

### 3. Was the State Court's Decision Contrary to or an Unreasonable Application of Clearly Established Federal Law?

Initially, this court notes that the California Court of Appeal did not find that admission of the polygraph evidence violated petitioner's due process rights. Rather, the Court of Appeals' determination of error was based solely on state law. Nonetheless, where a state court rejects some claims, but does not explicitly address the federal claim, this court must presume the federal claim was adjudicated on the merits. Johnson v. Williams, 568 U.S. 289, 293 (2013).

33

1    Therefore, this court assumes the Court of Appeal also found no violation of petitioner's

2    due process rights.  That decision did not violate clearly established federal law.  Generally

3    speaking, the admission of polygraph evidence does not violate the Constitution.  See Middleton

4    v. Cupp, 768 F.2d 1083, 1085-86 (9th Cir.1985); Ortega v. Clark, No. 2:08-cv-1657-KJM TJB,

5    2011 WL 836436, at *22 (E.D. Cal. Mar. 3, 2011), rep. and reco. adopted, No. 2:08-cv-1657-

6    KJM TJB (E.D. Cal. Sept. 30, 3011); Carrillo v. Kramer, No. SA CV 07–1324-PSG, 2010 WL

7    129675, at *8 (C.D. Cal. Jan. 8, 2010); Walker v. Marshall, No. C-95-20390 RPA, 1996 WL

8    130821, at *2 (N.D. Cal. Mar. 11, 1996), aff'd, 168 F.3d 504 (9th Cir. 1999).  Thus, it is solely an

9    issue of state law. See, e.g., Cacoperdo v. Demosthenes, 37 F.3d 504, 510 (9th Cir.1994).  A court

10   does not review issues of state law in federal habeas proceedings.  See Estelle v. McGuire, 502

11   U.S. 62, 68 (1991).

12   Even if petitioner is entitled to review of the admission of this evidence as fundamentally

13   infecting the fairness of his trial, he should not succeed on this claim.  As described by the Court

14   of Appeal, the admission of the evidence, and the prosecutor's brief argument, did not affect the

15   verdict.  The prosecution's evidence was weighty, and the polygraph evidence was just one of

16   many inculpatory statements made and actions taken by petitioner after he was confronted.

17   Petitioner repeatedly asked Marisa not to call the police; testimony showed that petitioner took

18   the victims to a restaurant the next day and apologized to them; and petitioner fled to Mexico

19   where he changed his name and lived for six years before he was apprehended.  Petitioner claim

20   that the admission of Marisa's testimony that he was silent when asked if he would take a

21   polygraph test violated his due process rights should fail.

22   **B.  Impeachment with Juvenile Crime**

23   Prior to trial, the prosecution sought permission to impeach petitioner with evidence of his

24   1996 adjudication for involuntary manslaughter if petitioner chose to testify.  The trial court ruled

25   that the "probative value of this impeachment evidence outweighs any prejudicial impact, and the

26   jury is entitled to assess this evidence in evaluating his credibility should he decide to testify."  (I

27   RT 31.)  The trial court stated that "precluding impeachment of Mr. Chavez, should he testify,

28   would give him a false aura of veracity as it would suggest to the jury that he's led a generally

34

1    legally blameless life." (Id.)  Defense counsel then asked that the crime be sanitized in the event

2    petitioner testified so that it would be referenced only as a crime of moral turpitude, the

3    prosecution agreed, and the court so ordered.  (I RT 31-32.)

4           Petitioner argues that because he was a juvenile at that time, the crime was not a felony

5    and the adjudication did not amount to a "conviction."  (ECF No. 2 at 40.)  Therefore, petitioner

6    contends, the juvenile adjudication should not have been available as impeachment.  Petitioner

7    claims he was prejudiced by trial court's ruling because he would have testified had the trial court

8    not ruled that this impeachment evidence was admissible.

9           To the extent that petitioner contends that the juvenile adjudication should have been

10   excluded pursuant to California state evidentiary law, his claim fails because habeas corpus will

11   not lie to correct errors in the interpretation or application of state law.  Estelle, 502 U.S. at 67.

12          With respect to petitioner's due process claim, as described above, there is no clearly

13   established federal law that admission of irrelevant or overly prejudicial evidence can constitute a

14   due process violation warranting habeas corpus relief.  See Holley v. Yarborough, 568 F.3d 1091,

15   1101 (9th Cir. 2009).  Nor has the Supreme Court held more specifically that admission of prior

16   bad acts evidence to prove propensity violates a criminal defendant's federal constitutional due

17   process right to a fair trial.  See Estelle, 502 U.S. at 75 n.5 ("[W]e express no opinion on whether

18   a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence

19   to show propensity to commit a charged crime.").  Finally, some courts have specifically found

20   no clearly established Supreme Court precedent that the admission of a juvenile adjudication for

21   impeachment violates due process.  Perets v. Montgomery, No. CV 18-7540-R(KK), 2019 WL

22   1601394 (C.D. Cal. Jan. 3, 2019) (no clearly established Supreme Court precedent supported

23   petitioner's claim regarding the admission of evidence of a prior juvenile adjudication for

24   impeachment), rep. and reco. adopted, 2019 WL 2764121 (C.D. Cal. June 28, 2019); Thalheimer

25   v. Grounds, No. CV 13-5304-DMG (DFM), 2015 WL 1405414, at *19 (C.D. Cal. March 26,

26   2015) (same).  This "absence of Supreme Court precedent on point forecloses any argument that

27   the state court's decision was contrary to or an unreasonable application of clearly established

28   federal law." Jennings v. Runnels, 493 F. Appx. 903, 906 (9th Cir. 2012).

Even assuming that improper impeachment evidence may rise to the level of a due process violation warranting habeas corpus relief, this is not such a case.  An evidentiary ruling renders a trial so fundamentally unfair as to violate due process only if "there are no permissible inferences the jury may draw from the evidence."  Windham v. Merkle, 163 F.3d 1092, 1103 (9th Cir. 1998) (quoting Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir.1991)); see also Smith v. Hawaii, 304 F. App'x 535, 536 (9th Cir. 2008) (citing Windham, 163 F.3d at 1103).  Here, the evidence would have been relevant to the jury's determination of petitioner's credibility, which he could have chosen to put at issue by testifying.  Further, the prejudicial effect of that evidence would have been minimized by the trial court's decision to sanitize the description of the adjudication so that the jury was only aware that the incident was a criminal act involving moral turpitude rather than manslaughter.  Petitioner fails to show that the decision that his prior juvenile adjudication was admissible was either arbitrary or so prejudicial that it rendered the trail fundamentally unfair.

Petitioner has not demonstrated that the California court's denial of his claim was contrary to or an unreasonable application of clearly established federal law.

**IX.  Cumulative Error**

"[P]rejudice may result from the cumulative impact of multiple deficiencies."  Harris v. Wood, 64 F.3d 1432, 1438–39 (9th Cir. 1995) (finding cumulative prejudice from counsel's performance that was "deficient in eleven ways, eight of them undisputed" which "obviates the need to analyze the individual prejudicial effect of each deficiency," but noting that "some of the deficiencies [may be] individually prejudicial") (internal quotation and citation omitted). "[W]here the government's case is weak, a defendant is more likely to be prejudiced by the effect of cumulative errors.  This is simply the logical corollary of the harmless error doctrine which requires us to affirm a conviction if there is overwhelming evidence of guilt."  United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996) (internal citation and quotation omitted); United States v. Nadler, 698 F.2d 995, 1002 (9th Cir. 1983) (when examining "the cumulative effect of several errors [, ...] [w]hether the alleged errors prejudiced the [petitioner's right] to a fair trial depends in turn upon the strength of the Government's [case] against [him]; the stronger the

1    prosecution's case, the less likely that a [petitioner] would be prejudiced by error or

2    misconduct").

3        Even were petitioner to succeed on his assertions that each area addressed above

4    amounted to error, he fails to show that the total effect of those errors impacted the verdict.  As

5    described above, the prosecution's case was strong and supported by interviews and testimony of

6    the victims, corroborating testimony from others, and petitioner's conduct after his behavior was

7    revealed to adults.  Even if petitioner's claims all amounted to errors, the cumulative effect of

8    those errors did not render petitioner's trial fundamentally unfair because petitioner fails to

9    establish that the prejudice from each error was anything more than negligible.  See Parle v.

10   Runnels, 505 F.3d 922, 927 (9th Cir. 2007).

11                                   **CONCLUSION**

12       Because petitioner fails to meet the standards set out in 28 U.S.C. § 2254(d) by showing

13   the state courts' decisions on his claims were contrary to or an unreasonable application of clearly

14   established federal law, this court need not reach petitioner's request for an evidentiary hearing

15   under § 2254(e)(2).  See Cullen v. Pinholster, 563 U.S. 170, 186 (2011) ("Section 2254(e)(2)

16   continues to have force where § 2254(d)(1) does not bar federal habeas relief.").

17       For the foregoing reasons, the Clerk of the Court is HEREBY ORDERED to randomly

18   assign a district judge to this case.

19       Further, IT IS RECOMMENDED that petitioner's petition for a writ of habeas corpus be

20   denied.

21       These findings and recommendations will be submitted to the United States District Judge

22   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within thirty days after

23   being served with these findings and recommendations, any party may file written objections with

24   the court and serve a copy on all parties. The document should be captioned "Objections to

25   Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be

26   filed and served within seven days after service of the objections.  The parties are advised that

27   failure to file objections within the specified time may result in waiver of the right to appeal the

28   district court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  In the objections, the

party may address whether a certificate of appealability should issue in the event an appeal of the judgment in this case is filed.  See Rule 11, Rules Governing § 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

Dated:  June 9, 2020

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

DLB:9
DB/prisoner-habeas/chav1169.fr